

ORIGINAL

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

DEC 1 2 2017
9:52

CLERK, U.S. DISTRICT COURT
By _____
Deputy

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| CQUENTIA SERIES, LLC AND HTG SERIES, A SERIES DECLARED BY CQUENTIA SERIES, LLC | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Case No. 4:17-cv-00919-A |
| | § | State Court Cause No. 348-295398-17 |
| CHANNEL (H), INC. AND ROBERT CAPELLI | § § § | |
| Defendants. | § § | |

**APPENDIX IN SUPPORT OF
PLAINTIFFS' JOINT MOTION TO REMAND AND BRIEF IN SUPPORT**

Plaintiffs in the above-styled case file this Appendix in Support of Plaintiffs' Joint Motion to Remand and Brief in Support.

| Exhibit No. | Document | Appendix Pages |
|---|---|---|
| A | Plaintiffs' Original Petition | 4-14 |
| B | Defendants' Notice of Removal | 15-21 |
| C | Channel (H)'s Verified Complaint | 22-59 |
| D | Declaration of D. Alan Meeker | 60-63 |
| D-1 | Certificate of Amendment | 64-65 |

Respectfully submitted,

Rafael C. Rodriguez
State Bar No. 24081123
rrodriguez@winstead.com
Jeffery Gilmore
State Bar No. 24083073
jgilmore@wintstead.com

**WINSTEAD PC**
300 Throckmorton Street, Suite 1700
Fort Worth, Texas 76102
Telephone:     (817) 420-8200
Facsimile: (817) 420-8201

– and –

Bill Warren
State Bar No. 00786331
bill.warren@kellyhart.com
Ryan Roper
State Bar No. 24098347
ryan.roper@kellyhart.com

**KELLY HART & HALLMAN LLP**
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone:     (817) 332-2500
Facsimile:     (817) 878-9280

**ATTORNEYS FOR
PLAINTIFFS CQ AND HTG**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was served upon all counsel of record through the Court's electronic filing and service system on the 12th day of December 2017.

_Rafael C. Rodriguez_

Rafael C. Rodriguez

348-295398-17

FILED
TARRANT COUNTY
9/28/2017 5:01 PM
THOMAS A. WILDER
DISTRICT CLERK

## CAUSE NO. _____

| | | |
|---|---|---|
| CQUENTIA SERIES, LLC AND | § | IN THE DISTRICT COURT |
| HTG SERIES, A SERIES DECLARED | § | |
| BY CQUENTIA SERIES, LLC | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| v. | § | TARRANT COUNTY, TEXAS |
| | § | |
| CHANNEL (H), INC. AND | § | |
| ROBERT CAPELLI | § | |
| | § | |
| **Defendants.** | § | _____JUDICIAL DISTRICT |

### PLAINTIFFS' ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

CQuentia Series, LLC ("CQuentia") and HTG Series, a series declared by CQuentia Series, LLC ("HTG") (collectively, "Plaintiffs") file this Original Petition complaining against Defendants Channel (H), Inc. and Robert Capelli (collectively, "Defendants"), and in support thereof respectfully state:

### I.
### DISCOVERY LEVEL

1.      Plaintiffs request that the discovery in this case be conducted under Level 3 as described in Texas Rule of Civil Procedure 190.4.

### II.
### PARTIES

2.      Plaintiff CQuentia is a Texas series limited liability company with its principal place of business in Tarrant County, Texas.

3.      Plaintiff HTG Series is a series declared by CQuentia Series, LLC, a Texas series limited liability company, with its principal place of business in Tarrant County, Texas.

4.      Defendant Channel (H), Inc. ("Channel (H)") is a Delaware corporation with its

---

**APP. 004**

principal place of business in Essex County, Massachusetts. Channel (H) may be served with process pursuant to TEX. CIV. PRAC. & REM. CODE § 17.044-045 by service of two copies of process upon the Texas Secretary of State, and the Texas Secretary of State shall then immediately mail the citation and petition by certified mail return receipt requested, to Channel (H) at its home office located at P.O. Box 99, Amesbury, Massachusetts 01913.

5.      Defendant Robert Capelli ("Capelli") is an individual who resides in Placer County, California. Capelli may be served with process pursuant to TEX. CIV. PRAC. & REM. CODE § 17.044(a)-(b) by service of two copies of process upon the Texas Secretary of State, and the Texas Secretary of State shall then immediately mail the citation and petition by certified mail return receipt requested, to Robert Capelli, at Capelli's home located at 5145 Railroad Avenue, Rocklin, California 95677.

### III.
### JURISDICTION AND VENUE

6.      Jurisdiction is proper over the Defendants because the matter in controversy exceeds this Court's minimum jurisdictional limits, but the matter in controversy is not greater than $75,000.

7.      The Court also has personal jurisdiction over Defendants because Channel (H) executed an agreement with Plaintiff CQuentia Series, LLC relating to this cause of action in which Channel (H) agreed that any dispute under such agreement would be resolved by the court of competent jurisdiction in Tarrant County, Texas.

8.      Venue is proper in Tarrant County, Texas pursuant to TEX. CIV. PRAC. & REM. CODE § 15.002(a)(1) because all or a substantial part of the events or omissions giving rise to the claim occurred in Tarrant County, Texas. Additionally, venue is proper in Tarrant County, Texas pursuant to TEX. CIV. PRAC. & REM. CODE § 15.020 because the parties against whom this action

is brought agreed in writing that venue shall lie exclusively in Tarrant County, Texas for any

dispute related to an agreement on which Plaintiffs' claims are premised.

## IV.
## FACTUAL BACKGROUND

9.      CQuentia is an information technology company based in Fort Worth, Texas,

specializing in genetic testing that improves patient health outcomes and reduces long-term

healthcare costs.  HTG Series is a series declared by CQuentia for the specific purpose of doing

business with Defendants Channel (H) and Capelli.

10.      Channel (H) purportedly specializes in software development for healthcare and

information technology companies. Capelli is the chief executive officer of Channel (H). Capelli

at all relevant times has been the primary representative of Channel (H) in its dealings with

CQuentia and HTG.

11.      In the second quarter of 2016, CQuentia and HTG were marketing CQuentia's

genetic testing services to the University of California – San Diego ("UCSD").  Under that

proposed arrangement, CQuentia would perform the genetic tests on UCSD's patients, and

UCSD would pay CQuentia for its testing services out of the reimbursement proceeds paid by

the health insurance companies providing coverage to the particular patients receiving the

genetic tests.

12.      Health insurance companies determine whether to pay for genetic tests based on

the particular patient's medical condition, health insurance policy coverage, and deductibles, and

the prescribing physician's diagnosis and codes indicated by the physician describing the

patients' conditions, and other variables.  The insurance coverage decision is made on a case-by-

case basis.  Without the benefit of a software solution, the coverage determination is typically

completed manually through laboratory representatives reviewing each requisition form for the

---

genetic tests and the corresponding medical records and telephonically contacting the health insurer to discuss the particulars of each case.

13.    Laboratory operators, such as CQuentia, are interested in an early and accurate determination so they do not incur the substantial out-of-pocket expense of running the test only to find that the patients' insurer will not cover the test fee.

14.    Health systems, such as UCSD, are interested in an early and accurate coverage determination so that neither the hospital nor its patients face uninsured liability to the laboratory for the various test expenses.

15.    CQuentia approached Capelli and inquired whether his company, Channel (H), could develop a software solution that could provide an early and accurate determination of coverage for the UCSD patients serviced by CQuentia.

16.    Prior to CQuentia and HTG entering into any agreements with Channel (H) and/or Capelli, Capelli represented to CQuentia and HTG that if CQuentia and HTG entered into agreements with Channel (H), Channel (H) would provide the Preauthorization Software Solution, which Capelli further represented would "instantaneously" electronically access the patients' medical records and insurance coverage and accurately determine "98% of the time" whether the insurance company would provide coverage for the genetic tests.

17.    CQuentia and HTG reasonably relied on Capelli's representations and subsequently entered into the three agreements referenced below.

18.    The initial agreement among the parties was styled "License Agreement" dated June 2, 2016, and was between Channel (H) and CQuentia (the "License Agreement"). The License Agreement was intended to enable CQuentia to communicate between its Lab Information System ("LIS"), the EMR system, and UCSD.

---

19.     The License Agreement was "superseded and replaced" by the Channel (H) Cloud Data Services Terms of Service and Agreement between Channel (H) and HTG Series, dated October 29, 2016 (the "Cloud Agreement").   The Cloud Agreement differed from the License Agreement in at least four (4) important respects: (1) the Cloud Agreement explicitly "superseded and replaced" the License Agreement; (2) CQuentia was not a party to the Cloud Agreement and thus not bound by its terms; (3) the stated purpose of the Cloud Agreement was to allow HTG to "access and retrieve electronic medical records of the EPIC system of out-patients of the University of California – San Diego Health and Medical Center for further bundling, sorting and reporting;" and (4) the fees payable to Channel (H) were increased from $495 per month to $595 per month per health system client of HTG Series.

20.     The Cloud Agreement did not mention any client of the Plaintiffs other than UCSD, and did not require Defendants to be involved with UCSD or any particular number of transactions regarding UCSD.   Moreover, the Cloud Agreement does not require either Plaintiff to work exclusively with Defendants in connection with UCSD.

21.     The third agreement was the "Software License and Network Service Agreement" between CQuentia Series, LLC and Channel (H), dated as of December 19, 2016 but executed in January 2017   (the "Software License Agreement"). HTG was not a party to the Software License Agreement. Under the Software License Agreement, Channel (H) was obligated to provide General Medical Eligibility Information including but not limited to: (a) patient's health insurance; (b) policy benefits; (c) amount of annual deductible and how much has been paid; (d) co-pay requirements; and (e) whether genetic counseling or other pre-conditions are required. Such information was required to be correct at least 98% of the time pursuant to the representations made by Capelli and the terms of the Software License Agreement.   Channel

---

(H)'s fee for this Electronic Prior Authorization was to be $12.00 per transaction, and a Real Time Eligibility Call Fee of $0.37 per call.

22.    The Software License Agreement did not require that Channel (H) actually be involved with HTG or CQuentia providing genetic testing services to UCSD or any other particular client of HTG or CQuentia.

23.    In or around May 2017, CQuentia and Channel (H) executed a letter of intent regarding CQuentia's possible acquisition of an ownership interest in Channel (H) as well as a Non-Disclosure, Confidentiality & Non-Circumvention Agreement, dated May 16, 2017 (the "Non-Circumvention Agreement"). The Non-Circumvention Agreement provided that: (a) neither party would use "Confidential Information" for any purpose other than "the Project" (which was not defined); (b) only Channel (H) would be subject to its non-circumvention limitations in Section 5; and (c) any dispute among the parties would be resolved by the courts in Tarrant County, Texas.

24.    However, by August 2017, notwithstanding CQuentia's payments to Channel (H) totaling over $150,000, it became apparent that Channel (H)'s Preauthorization Software Solution failed to work within the required performance specifications. As a result, CQuentia was required to develop its own pre-authorization software solution ("CQuentia's Preauthorization Software Solution") rather than continue to waste valuable time and money on the Channel (H)'s Preauthorization Software Solution and risk losing its relationship with UCSD.

25.    On September 26, 2017, Defendant's counsel sent CQuentia a letter accusing CQuentia of wrongfully using Channel (H)'s intellectual property and "secret sauce" to develop an alternative preauthorization software solution. In Channel (H)'s September 26, 2017 letter,

Channel (H) demanded that CQuentia essentially stop doing business with various health systems unless CQuentia and HTG agreed to a perpetual license of Channel (H)'s Preauthorization Software Solution.

26.     None of the agreements referenced above prohibit Plaintiffs from developing and implementing their own pre-authorization software solution that does not compromise "Confidential Information" of Channel (H) as contemplated in the Non-Circumvention Agreement or other proprietary information as contemplated in the other agreements.

27.     CQuentia and HTG expressly deny any unauthorized use of Channel (H)'s alleged confidential or other proprietary information and further deny any of the wrongdoing alleged in Channel (H)'s September 26, 2017 letter.

## V.
## CAUSES OF ACTION

**COUNT ONE -- Request for Declaratory Judgment**

28.     Plaintiffs incorporate paragraphs 1-27 above.

29.     A declaratory judgment is appropriate when a justiciable controversy exists as to the rights and status of the parties and such controversy will be resolved by the declaration sought.

30.     In the instant case, there exists a bona fide, concrete controversy ripe for resolution by way of declaratory judgment. Specifically, Channel (H) contends that the agreements set forth above impose certain obligations on Plaintiffs, which Plaintiffs expressly deny. Additionally, Channel (H) contends that Plaintiffs are in breach the agreements set forth above, which Plaintiffs also expressly deny. Furthermore, Plaintiffs contend they are entitled to develop and implement Plaintiffs' Preauthorization Software Solution free and clear of any obligation to Channel (H), despite Channel (H)'s assertion otherwise.   Accordingly, Plaintiffs

---

APP. 010

seek an order from the Court declaring that: (1) the agreements referenced above do not impose obligations on Plaintiff as Channel (H) contends; (2) that Plaintiffs have not breached the agreements referenced above; and (3) that the agreements referenced above do not bar Plaintiffs from developing and implementing their own Preauthorization Software Solution free and clear of any obligation to Channel (H).

**COUNT TWO – Breach of Contract**

31.     Plaintiffs incorporate paragraphs 1-30 above.

32.     HTG and Channel (H) entered into the Cloud Agreement within the past four (4) years. Channel (H) breached the Cloud Agreement by failing to perform the obligations imposed on Channel (H) under the terms of the Agreement as set forth above. As a result of Channel (H)'s breach of the Cloud Agreement, HTG has suffered damages, whether characterized as general or special, in an amount to be determined at trial, all of which HTG is entitled to recover from Channel (H).

33.     Additionally, CQuentia and Channel (H) entered into the Software License Agreement within the past four (4) years. Channel (H) breached the Software License Agreement by failing to perform the obligations imposed on Channel (H) under the terms of the Software License Agreement as set forth above. As a result of Channel (H)'s breach of the Software License Agreement, CQuentia has suffered damages, whether characterized as general or special, in an amount to be determined at trial, all of which CQuentia is entitled to recover from Channel (H).

## COUNT THREE – Fraud

34.     Plaintiffs incorporate paragraphs 1-33 above.

35.     Prior to CQuentia and HTG entering into the agreements referenced above, respectively, Capelli represented to CQuentia and HTG that Channel (H) would perform according to specific specifications for the benefit of CQuentia and HTG if CQuentia and HTG entered into the agreements referenced above. CQuentia and HTG reasonably relied on said representations and subsequently entered into the agreements referenced above, respectively. But for Capelli's representations, CQuentia and HTG would not have entered into the agreements referenced above and, therefore, the representation was material. Upon information and belief, at the time Capelli made said representations, Capelli knew Channel (H) did not have the capability to provide the promised services. Channel (H) continues to not have the capability to provide the promised services, despite Capelli's representations to CQuentia and HTG prior to CQuentia and HTG, respectively, entering into the agreements referenced above. Accordingly, Capelli's representations to CQuentia and HTG were false.

36.     Furthermore, upon information and belief, Capelli made said misrepresentations to CQuentia and HTG with the intent that CQuentia and HTG would rely on it. In fact, CQuentia and HTG did reasonably rely on Capelli's misrepresentations and entered into the agreements referenced above. As stated above, Channel (H) did not perform the obligations imposed on it under the terms of the agreements referenced above, and CQuentia and HTG suffered monetary damages as a result in an amount not greater than $75,000. Accordingly, CQuentia and HTG seek to recover from Capelli the damages incurred by CQuentia and HTG as a result of CQuentia and HTG's reasonable reliance on Capelli's misrepresentations, including without limitation exemplary damages as allowed by TEX. CIV. PRAC. & REM. CODE § 41.003.

## VI.
## ATTORNEYS' FEES

37.     Plaintiffs incorporate paragraphs 1-36 above.

38.     As a direct and proximate result of this dispute, Plaintiffs have been required to retain the undersigned counsel to prosecute this action.  Accordingly, Plaintiffs have incurred attorneys' fees which are reimbursable under Section 37.009 of the Texas Civil Practice and Remedies Code.

## VII.
## CONDITIONS PRECEDENT

39.     All conditions precedent to bringing this action have occurred or have been waived by Channel (H) and/or Capelli.

## VIII.
## REQUEST FOR DISCLOSURE

40.     Pursuant to TEX. R. CIV. P. 194, CQuentia and HTG hereby request Channel (H) and Capelli to disclose, within fifty (50) days after service of this Original Petition, the information and material described in TEX. R. CIV. P. 194.2.

## IX.
## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiffs CQuentia Series, LLC and HTG Series, a series declared by CQuentia Series, LLC, request that Defendants Channel (H), Inc. and Robert Capelli be cited to appear herein and upon trial hereof, CQuentia and HTG recover judgment against Channel (H) and Capelli for:

- Monetary relief of $75,000 or less (including exemplary damages) and non-monetary relief (*see* TEX. R. CIV. P. 47(c));

- All other actual damages, whether characterized as general or special, to which Plaintiffs are entitled;

---

APP. 013

- Exemplary damages;

- Prejudgment and post-judgment interest as provided by law;

- Costs of court;

- Attorneys' fees; and

- Such other and further relief, both at law and in equity, to which Plaintiffs may be justly entitled.

Respectfully submitted,

Rafael C. Rodriguez
State Bar No. 24081123
Jeff Gilmore
State Bar No. 24083073

**WINSTEAD PC**
300 Throckmorton Street, Suite 1700
Fort Worth, Texas  76102
Telephone:     (817) 420-8200
Facsimile:     (817) 420-8201
Email:         rrodriguez@winstead.com
               jgilmore@winstead.com

**ATTORNEYS FOR PLAINTIFFS**

APP. 014

**UNITED STATES DISTRCT COURT**
**NORTHERN DISTRICT OF TEXAS**
FORTH WORTH DIVISION

| | |
|---|---|
| **CQUENTIA SERIES, LLC and**<br>**HTG SERIES, a series declared by**<br>**CQUENTIA SERIES, LLC**<br><br>*Plaintiffs,*<br><br>v.<br><br>**CHANNEL (H), INC. and**<br>**ROBERT CAPELLI,**<br><br>*Defendants.* | Case No.<br><br>State Court Cause No.: 348-295398-17 |

### NOTICE OF REMOVAL

Defendants CHANNEL (H), INC. and ROBERT CAPELLI ("Defendants"), specially appearing by and through their undersigned counsel, give notice that the above action is hereby removed from the 348th Judicial District, in the District Court of the State of Texas, in and for the County of Tarrant, in which Court said cause is now pending, to the United States District Court for the Northern District of Texas, without waiving any objections to personal jurisdiction, service of process, or the sufficiency of service of process.

IN SUPPORT THEREOF, DEFENDANTS state as follows:

1.      This action arises under and presents substantial questions of federal law under the Copyright Act, 17 U.S.C. § 101 *et seq.*[1]

---

[1] A federal court action for copyright infringement and other claims was filed by defendant Channel (H), Inc. against these plaintiffs on November 14, 2017, in the matter entitled *Channel (H), Inc. v. CQuentia Series, LLC, HTG Series, a series declared by CQuentia Series, LLC, and Alan Meeker*, United States District Court for the Northern District of Texas, Case No. 4:17-cv-00916-O, all of which involves the same copyrighted computer software, and arises out of the exact same set of facts.

1

2.      Removal of this cause is proper under 28 U.S.C. §§ 1331, 1338, 1367, 1400(a), 1441(b) and (c), and 1454. Moreover, under 28 U.S.C. § 1338(a), such federal court jurisdiction in copyright cases is exclusive of the state courts.

3.      Of the above bases, this cause is specifically removable under 28 U.S.C. § 1441(c) because it includes a claim arising under the laws of the United States, namely a declaration that Plaintiffs are not infringing computer software that is protected by the federal Copyright Act, 17 U.S.C. § 101 *et seq.*, and because the Court has both original jurisdiction and exclusive jurisdiction under 28 U.S.C. §§ 1331, 1338, and 1367.

4.      Additionally, defendant Channel (H), Inc. has asserted, or if necessary, will assert herein, a claim for relief under the Copyright Act against these plaintiffs. Thus, removal is proper under 28 U.S.C. § 1454(a).

## BASIS OF REMOVAL

5.      On November 14, 2017, Channel (H) brought an action in this Court for copyright infringement in violation of the Copyright Act, misappropriation of trade secrets in violation of the Delaware Uniform Trade Secrets Act ("DeUTSA"), 6 *Del. C.* §. 2001 *et seq.* and Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836; and, inter alia, unfair competition and tortious interference, all arising out of Plaintiffs' unlawful theft of Channel (H)'s healthcare data technology, software and interface (the "Channel (H) Federal Action"). A copy of the complaint in the Channel (H) Federal Action is attached hereto as **Exhibit A**.

6.      In the Channel (H) Federal Action, Channel (H) alleges that Plaintiffs gained access to confidential and trade secret information of Channel (H) under the guise of making an investment in Channel (H), after Plaintiffs entered into various software license agreements. Notwithstanding the fact that the copyright and trade secret information were subject to those

2

various licenses, non-disclosure, non-compete, and non-circumvention agreements, Plaintiffs blatantly stole Channel (H)'s extremely valuable trade secrets and software to create the own copycat software, and have threatened retribution if Channel (H) takes legal action to enforce its rights.

7.      Prior to filing suit in this Court, on or about September 26, 2017, counsel for Channel (H) sent Plaintiffs a cease-and-desist letter entitled *"Breach of Channel (H) Agreements, Theft of Trade Secrets, Copyright Infringement,"* informing Plaintiffs that Channel (H) would bring a lawsuit for, inter alia, copyright infringement if Plaintiffs did not cease using Channel (H)'s copyrighted computer software and trade secret information within 48 hours, i.e. by September 28. 2017.

8.      According to the public docket for the 348th Judicial District, in the District Court of the State of Texas, in and for the County of Tarrant, Plaintiffs filed the instant cause by petition dated September 28, 2017 (The "CQ State Court Action"). A copy of the petition in the CQ State Court Action is attached hereto as **Exhibit B**. The CQ State Court Action includes three claims: declaratory judgment, breach of contract and fraud. Attached hereto as **Exhibit C** is a copy of the docket sheet in the CQ State Court Action as of November 14, 2017, including an index of all documents filed in the CQ State Court Action, indicating the date the document was filed.

9.      Defendant Channel (H) received a copy of the petition in the CQ State Court Action on or about November 7, 2017 in the mail. According to the summons attached thereto, Plaintiffs purported served the Texas Secretary of State with a copy of the petition in the CQ State Court Action on or about October 16, 2017. To date, Defendant Robert Capelli has not received a copy of the petition in the CQ State Court Action.

3

APP. 017

10.     The CQ State Court Action involves the same computer software and arises out of the same facts as the Channel (H) Federal Action.  The CQ State Court Action references the claims that are asserted in the Channel (H) Federal Action, and the fact that Channel (H) threatened to assert these claims, including copyright infringement, in a lawsuit – a suit that could only be brought in federal court. *See* Exhibit B at ¶ 25. Indeed, in the CQ State Court Action, Plaintiffs seek a declaratory judgment that Plaintiffs are not barred from "developing and implementing their own Preauthorization Software Solution free and clear of any obligation to Channel (H)" precisely because "Defendant's counsel sent CQuentia a letter accusing CQuentia of wrongfully using Channel (H)'s intellectual property and 'secret sauce' to develop an alternative preauthorization software solution." *See* Exhibit B at ¶¶ 25, 30.

11.     Therefore, pursuant to 28 U.S.C. §§ 1441(c) and/or 1454, removal to this Court is proper.

12.     Furthermore, this Court also has original jurisdiction under 28 U.S.C. §1332, and this case is one that may be removed to this Court by Defendants pursuant to 28 U.S.C. §1441(b), as this is a civil action between citizens of different states and the matter in controversy is in excess of $75,000, exclusive of interests and costs.  Plaintiffs' petition in the CQ State Court Action alleges that CQentia Series, LLC is a Texas limited liability company with a principal places of business in Tarrant County, Texas. *See* Exhibit B at ¶ 2.  Plaintiffs allege that HTG Series is a series declared by CQuentia Series, LLC, with a principal places of business in Tarrant County, Texas. *See* Exhibit B at ¶ 3.  Plaintiffs allege that defendant Channel (H), Inc. is a Delaware corporation with a principal place of business in Essex County, Massachusetts. *See* Exhibit B at ¶ 4.  Finally, Plaintiffs allege that Robert Capelli is an individual residing in Placer

APP. 018

County, California. *See* Exhibit B at ¶ 5.  As such, complete diversity exists between Plaintiffs and Defendants. *See* 28 U.S.C. §§ 1332 and 1441(b).

13.   As to the amount in controversy, Plaintiffs' purported monetary damages, in addition to their request for non-monetary relief, will exceed $75,000. *See* Exhibit B at ¶¶ 6, 31, 33, 36 and "Prayer for Relief".

14.   In the CQ State Court Action, Plaintiffs claim that "the matter in controversy is *not* greater than $75,000." *See* Exhibit B at ¶ 6. (emphasis added).  This statement appears to be an attempt to avoid litigating the matter in federal court, however, Plaintiffs also seek "non-monetary relief," which increases the amount in controversy beyond $75,000.  In this case, the "non-monetary relief" that Plaintiffs seeks is, inter alia, a declaration of non-infringement of Channel (H)'s copyrights and that they have not misappropriated Channel (H)'s trade secrets (*See* Exhibit B at ¶¶ 25-30)—i.e. the same claims for which Channel (H) seeks more than $12,000,000 in damages in the Channel (H) Federal Action. (*See* Exhibit A)  Even were this Court limited to the facts pleaded in the CQ State Court Action, the pleading in that action references license fees of $150,000.  Considering that Plaintiffs, themselves, valued a limited *license* of the disputed trade secrets and software at $150,000, the amount truly in controversy easily exceeds $75,000. (*See* Exhibit B at ¶¶ 24).   Thus, in accordance with 28 U.S.C. §1446(c)(2)(A), this Court may accept the Defendants' assertion herein that the amount in controversy exceeds $75,000 because, in addition to seeking "Monetary relief of $75,000 or less," Plaintiffs' combined request for non-monetary relief will clearly exceed the jurisdictional limits. *See* Exhibit B at p. 10, "Prayer for Relief".

APP. 019

## COMPLIANCE WITH OTHER PROCEEDURAL REQUIREMENTS

15.     In compliance with the requirements of 28 U.S.C. §1446(a), the Defendants have attached hereto copies of all process, pleadings, and orders served upon such Defendants in the CQ State Court Action at Exhibits B and C. This Notice of Removal is timely under 28 U.S.C. §1446(b) as it is filed within 30 days after the receipt by Defendant Channel (H), Inc. of a copy of the petition filed by Plaintiffs in the CQ State Court Action. Pursuant to 28 U.S.C. §1446(d), Defendants will file a Notice of Removal with the District Court of Tarrant County, Texas. A copy of the form of Notice of Removal is attached as **Exhibit D**. The State Court Notice of Removal and this Notice of Removal will also be served upon Plaintiffs. A copy of the Index is also attached as **Exhibit E**.

NOW THEREFORE, all parties to the civil action *CQuentia Series, LLC et al. vs. Channel (H), Inc., et al.*, pending in the 348th Judicial District, in the District Court of the State of Texas, in and for the County of Tarrant, Cause No. 348-295398-17, are hereby notified pursuant to 28 U.S.C. §1441(b)-(c) and §1446 that all claims and causes of action against Defendants are removed upon the filing of a copy of this "Notice of Removal" with the Clerk of the United States District Court for the Northern District of Texas.

APP. 020

Dated: November 14, 2017

Respectfully submitted,

THE APGAR FIRM, PLLC

By: /s/ Margaret Horton Apgar
MARGARET HORTON APGAR
State Bar No. 24036805
1914 Skillman Street, Suite 110-150
Dallas, Texas 75206
(214) 707-2791 (Phone)
(214) 279-6050 (Fax)
margaret@apgarfirm.com

Of Counsel:
Brett E. Lewis
(*pro hac vice* forthcoming)
Justin Mercer
(*pro hac vice* forthcoming)
Lewis & Lin, LLC
45 Main Street, Suite 608
Brooklyn, New York 11201
Tel. (718) 243-9323
brett@ilawco.com
justin@ilawco.com

*Attorneys for Specially Appearing Defendants*

7

APP. 021

UNITED STATES DISTRCT COURT
NORTHERN DISTRICT OF TEXAS
FORTH WORTH DIVISION

CHANNEL (H), INC.,

*Plaintiff,*

v.

CQUENTIA SERIES, LLC;
HTG SERIES, a series declared by
CQUENTIA SERIES, LLC; and
D. ALAN MEEKER,

*Defendants.*

Case No.

## **VERIFIED COMPLAINT**

Plaintiff Channel (H), Inc. ("Channel (H)" or "Plaintiff"), by its undersigned attorneys, for its

complaint against Defendants CQuentia Series, LLC ("CQ"), HTG Series, a series declared by

CQuentia Series, LLC ("HTG"), and D. Alan Meeker ("Meeker," and with CQ and HTG

collectively, "Defendants"), alleges as follows:

### **STATEMENT OF CASE**

1.      Plaintiff brings this action for copyright infringement in violation of the Copyright

Act, misappropriation of trade secrets in violation of the Delaware Uniform Trade Secrets Act

("DeUTSA"), 6 *Del. C.* §. 2001 *et seq.* and Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C.

§ 1836; and, inter alia, unfair competition and tortious interference, all arising out of Defendants'

unlawful theft of Channel (H)'s healthcare data technology and interface.  Defendants gained

access to confidential and trade secret information of Channel (H) under the guise of making an

investment in Channel (H).  Notwithstanding the fact that the copyright and trade secret

information were subject to various licenses, non-disclosure, non-compete, and non-circumvention

agreements, Defendants blatantly stole Channel (H)'s extremely valuable trade secrets and

1

software, and have threatened retribution if Channel (H) takes legal action to enforce its rights. Channel (H) seeks injunctive relief, actual damages, statutory damages, punitive damages, exemplary damages, and recovery of its costs and reasonable attorneys' fees.

## PARTIES

2.      Channel (H) is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business in Amesbury, MA.

3.      Upon information and belief, CQ is a limited liability company organized and existing under the laws of the State of Texas, with its principal place of business at 4770 Bryant Irvin Court, Suite 300, Fort Worth, TX 76107.

4.      Upon information and belief, "HTG Series, a series declared by CQuentia Series, LLC" is a non-existent business entity or series, which is the alter ego of Meeker or subsidiary of CQ which transacts business in this State.  According to publically available information, no assumed name certificate has been or is filed with the State of Texas for "HTG Series" by CQ. Accordingly, references to CQ herein will also include HTG.

5.      Defendant Meeker is an individual who, upon information and belief, is domiciled in the State of Texas and transacts business in this State. At all relevant times, Meeker was and is the CEO and a Manager of CQ, and executed agreements relevant to the action herein on behalf of the non-existent "HTG."

6.      Upon information and belief, at all times material to this action, each of Defendants was the agent, servant, employee, partner, alter ego, subsidiary, or joint venture of the other Defendant, and the acts of each Defendant were in the scope of such relationship; in doing the acts and failing to act as alleged in this Complaint, each of the Defendants acted with

2

the knowledge, permission, and the consent of the other Defendant, and each Defendant aided and abetted the other Defendant in the acts and omissions alleged in this Complaint.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to the Copyright Act, 17 U.S.C. § 101, *et seq*. and the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. §§ 1832(a) and 1836.  This Court also has subject matter jurisdiction, *inter alia*, pursuant to 28 U.S.C. §§ 1331, 1332, 1338 and 1367.

8.      This Court has pendent jurisdiction of the related state law claims asserted in this action pursuant to 28 U.S.C. § 1367 because they involve the same parties, they arise from the same operative facts common to the causes of action arising under the federal claims, and because the exercise of pendent jurisdiction serves the interests of judicial economy, convenience and fairness to the parties.

9.      Additionally, this Court has personal jurisdiction over Defendants CQ, HTQ, and Meeker because they are residents of the State of Texas.

10.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §§ 1391(b) and 1400(a) because, upon information and belief, Defendants reside or may be found in this Judicial District.

## BACKGROUND

11.     This case is about Channel (H), an innovative technology company that created a revolutionary new platform, software, and process for pre-certifying patient approvals for medical tests, and CQ, a large, unscrupulous company that blatantly stole Channel (H)'s copyrights and trade secrets in violation of multiple licensing agreements and non-disclosure and non-circumvention agreements.

3

12.    Channel (H)'s platform allows for the automation of the medical test approval screening process. Traditionally, when a patient visits the hospital, if a doctor recommends that certain tests be performed, it can take hours or even days to receive an approval from the patient's insurance company. As a result, patients often choose not to have the tests done.

13.    Channel (H) created a way to automate that process, so that patients are pre-approved *before* they even set foot in a hospital. This greatly simplifies the insurance approval process for medical testing, and allows a company, such as CQ, to increase its revenues exponentially.

14.    Channel (H) created its software in 2014, which was filed with the U.S. Copyright Office on November 13, 2017 (the "Copyrighted Software").

15.    CQ immediately saw the value in Channel (H)'s proprietary technology and process, and entered into a series of agreements with Channel (H) to license its technology and Copyrighted Software, starting in mid-2016.

16.    The current dispute arises out of Defendants' breach of those agreements, misappropriation of Channel (H)'s trade secrets, and tortious interference with Channel (H)'s contract with the University of California San Diego hospital ("UCSD").

17.    Defendant Meeker is CQ's Chief Executive Officer. Meeker has been the sole signatory and primary decision maker from CQ with respect to all agreements with Channel (H).

18.    On June 2, 2016, Channel (H) entered into an agreement (the "June 2016 Agreement"), a copy which will be filed contemporaneously under seal as **Exhibit A**, to license CQ the use of its platform and Copyrighted Software, consisting of:

> Licensor's software and related Intellectual Property made available to Licensee via the Internet, which platform includes without limitation software, features, functionality and content created by Licensor, including but not limited to

4

> uni- and bi-directional interface with Customers' electronic
> medical records.

*See* June 2016 Agreement, Exhibit A.

19.     The June 2016 Agreement enabled CQ to communicate between its Lab
Information System ("LIS") and the electronic medical record ("EMR") system at UC San Diego
Health and Medical Center ("UCSD"), through use of Channel (H)'s connections.

20.     This worked much the way a physical tube or pipe works, providing the structure
through which data could pass through, but not yet including any data.

21.     On October 29, 2016, the parties entered into a second agreement (the "October
2016 Agreement"), this time for the license of certain data modules and access to Channel (H)'s
Integration Dashboard and Copyrighted Software.  A copy of the October 2016 Agreement will be
filed contemporaneously under seal as **Exhibit B**.

22.     The purpose of the October 2016 Agreement was to "allow Licensee to access and
retrieve electronic medical records on the EPIC system of out-patients of the University of
California-San Diego Health and Medical Center for further bundling, sorting and reporting." *See*
October 2016 Agreement, Exhibit B.

23.     Through the October 2016 Agreement, CQ obtained "[a]uthenticated access to the
Channel (H) Application Programming Interface that will interface with [CQ's] Application." *Id.*

24.     In other words, CQ licensed a bi-directional data pipe, the data modules that would
flow through it, and use of Channel (H)'s Copyrighted Software and reporting dashboard, where
CQ could log on, use, manage, and send data retrieved from hospital partners in real time.  This
functionality, which automated and greatly simplified the medical test application process, went
live on January 10, 2017.

APP. 026

25.    The October 2016 Agreement also contains a choice of law provision naming

Delaware Law as the governing law for the resolution of all disputes thereunder:

> The laws of the State of Delaware, without reference to its
> choice of law principles, govern this Agreement and any
> claims arising out of or relating to this Agreement or our
> relationship.

*See* October 29 Agreement, Exhibit B, ¶ 21.

26.    While Defendant Meeker executed the October 2016 Agreement on behalf of "HTG

Series," which, upon information and belief, was and is a non-existent business entity or series,

the October 2016 Agreement purported to "supersede[] and replace[] that certain Agreement

between [Channel (H)] *and CQuentia Series, LLC,* dated as of June 2, 2016." *See* October 29

Agreement, Exhibit B, at preamble (emphasis added).

27.    Dated as of December 19, 2016, and executed on January 17, 2017, Channel (H)

and CQ entered into a third agreement (the "January 2017 Agreement"), this time for the provision

of "Real-time, General Medical Benefit Eligibility Information," and "Electronic Prior

Authorization Transactions for Diagnostic Services." A copy of the January 2017 Agreement will

be filed contemporaneously under seal as **Exhibit C**.

28.    In other words, CQ wanted to use Channel (H)'s Copyrighted Software and

platform to pre-certify patients at UCSD for certain medical tests – namely, PGX genetic screening

tests.

29.    Channel (H) built a Schedule Report Feed ("SRF") API when UCSD informed all

parties that the SRF module would not be available through normal interface until late 2017 early

2018.

30.    The SRF allows for the filtering and logic of lists of UCSD patients to determine

eligibility for PGX screening tests.

6

**APP. 027**

31.     In this way, CQ would be able to determine which patients would be pre-approved to take its PGX screening tests *before* they actually set foot in the hospital, and nurses at the hospital could communicate this information to patients directly on the day of the appointment.

32.     Pre-certifications would be displayed on CQ's dashboard (via the Copyrighted Software) as Authorizations.

33.     Around this time, CQ first stated that it wanted to acquire Channel (H).  Robert Capelli, the founder and President of Channel (H), responded that he was not ready to sell.

34.     On February 4, 2017, Kevin Jones, COO of CQ, emailed Robert Capelli, informing him that the partners of CQ wanted to make an investment in Channel (H).

35.     After several months of negotiations, on May 16, 2017, Channel (H) and CQ signed a Term Sheet for Private Placement of Common Stock ("Term Sheet"). A copy of the Term Sheet will be filed contemporaneously under seal as **Exhibit D**.

36.     The Term Sheet provided for CQ to obtain a 20% stake in Channel (H) in exchange for an investment of $225,000.

37.     During the due diligence phase of the investment process, Channel (H) made available its source code to the Copyrighted Software and proprietary business processes to CQ's Chief Technology Officer, Floyd Russell, and CEO, Alan Meeker, subject to a non-disclosure agreement.

38.     On May 22, 2017, Channel (H)'s Robert Capelli provided CQ's Floyd Russell with access to the Github (which included, *inter alia*, all of the source code for the Copyrighted Software), admin panel (parse engine, data modules, and end points), and workflow documents.

APP. 028

39.     The proposed acquisition never closed, however, after Defendants had slipped a
$1,600,000 purchase option into the draft investment agreement without Channel (H)'s knowledge
or consent.

40.     When Robert Capelli brought the matter to CQ's attention, CQ's Alan Meeker
responded by asking Robert Capelli to name an option price.

41.     Channel (H) provided some examples of comparable valuations for health care
industry technology start-up companies in the range of $12,000,000 to $22,000,000.  CQ did not
respond.

42.     Instead, in August, 2017, CQ asked for a discount off of some of the existing
contract cost and expressed interest in negotiating a perpetual license.

43.     Channel (H) agreed to discount $31,215.00 of its fees, leaving two equal payments
remaining, totaling $62,430.00 – the first due on August 1, the second on September 1.

44.     CQ paid the August bill of $31,215.00 on August 19, 2017.  The September 1, 2017
invoice in the same amount has not been paid, despite repeated assurances that payment was
forthcoming.  CQ currently owes Channel (H) $34,842.03 in undisputed licensing fees.

45.     On August 29, 2017, CQuentia's CTO informed Robert Capelli that CQ planned
on using the SRF API to take pre-certification "in-house."

46.     On the parties' weekly call, Floyd Russell told Robert Capelli that CQ was going
to stop using Channel (H)'s platform for pre-certification, that he would be diverting the SRF API
from UCSD directly to CQ, and that Channel (H) would not be receiving that feed anymore.

47.     The SRF API is a workaround that Channel (H) built and licensed to UCSD so that
the hospital could deliver patient schedules to Channel (H) for Pre-Certification – and the logic
and workflow for this is 100% Channel (H)'s property, with Channel (H)'s custom endpoints to

8

APP. 029

run logic. There was no work-for-hire agreement, and all of the parties' agreements specify that ownership in all Channel (H) logic, ideas, workflow, specifications, code and otherwise is the sole property of Channel (H). *See* June 2016 Agreement, Exhibit A, § 3.3; October 2016 Agreement, Exhibit B, ¶¶ 20, 22, 31; January 2017 Agreement, Exhibit C, ¶ 3; *see also* May 2017 NDA, Exhibit E.

48.     Mr. Capelli asked Mr. Russell to read the parties' contracts before he did anything, as what he was proposing to do would be a breach of the above agreements, as well as the separate non-disclosure agreement.

49.     The agreements between the parties clearly anticipate and bar the type of conduct engaged in by CQ. The June 2016 Agreement, October 2016 Agreement, January 2017 Agreement, and May 2017 NDA, are collectively referred to herein as the "Agreements."

50.     Among other restrictions, the October 2016 Agreement prohibits CQ to: "modify, make derivative works of, disassemble, reverse compile or reverse er [sp] any part of the Cloud Services," or "use the Cloud Services to build a product or service that replicates or attempts to compete with the Cloud Services." *See* October 2016 Agreement, Exhibit B.

51.     The "Cloud Services" include "[a]ll services that we make available to you" through various Web sites. *See* October 2016 Agreement, Exhibit B, ¶ 2. All services provided by Channel (H) are made available by password-protected Web site.

52.     The October 2016 Agreement also states that CQ is "not granted any title or intellectual property rights in or to any software provided as part of the Cloud Services," and limits its use to permitted uses under the agreement. *See* October 2016 Agreement, Exhibit B, ¶¶ 20, 22.

APP. 030

53.     Section 30 of that agreement provides an exhaustive list of "Confidential Information," and prohibits its use, "except as required to perform its obligations under this Agreement." October 2016 Agreement, Exhibit B, ¶ 30.

54.     The January 2017 Agreement similarly prohibits CQ to "transfer, license, assign, translate, reverse engineer, decompile, disassemble, modify or duplicate the Software or any part thereof." January 2017 Agreement, Exhibit C, ¶ 2(a).

55.     The January 2017 Agreement also contains a warranty, restricting CQ's use of the Copyrighted Software, software tools, transaction specifications and other documentation provided by Channel (H) under the Agreement, and restricts CQ's use of the provided services, specifications and Copyrighted Software to use *in accordance with the terms and conditions of the agreement. See* January 2017 Agreement, Exhibit C, ¶¶ 2(g), 9 (emphasis added).

56.     In several places, the January 2017 Agreement makes clear that all rights in the Copyrighted Software, system, services, specifications and all intellectual property rights remain with Channel (H). *See* January 2017 Agreement, Exhibit C, ¶¶ 2(i), 3, 6. Paragraph 10 of the agreement also contains a non-disclosure clause, which further provides that the information provided by Channel (H) under the agreement is proprietary and CQ cannot use it.

57.     The Non-Disclosure, Confidentiality & Non-Circumvention Agreement, dated May 16, 2017 (the "May 2017 NDA"), entered into just days before Channel (H) shared its source code for the Copyrighted Software and specifications with CQ, further prohibits CQ from "directly or indirectly [using] Confidential Information belonging to [Channel (H)] for any purpose whatsoever except as required for the discussions among the Parties about the Project. A copy of the May 2017 NDA will be filed contemporaneously under seal as **Exhibit E**.

10

58.     In that May 2017 NDA, CQ agreed to use such disclosed information "solely for the purpose of evaluating, negotiating and implementing the Project," and expressly promised "not to utilize the Confidential Information to circumvent or to the detriment of the other." *See* May 2017 NDA, Exhibit E, ¶ 1.

59.     CQ agreed, again, on the same date, that: "[a]ll non-public, confidential and/or proprietary information of the Company received by CQ in connection with the negotiation of the investment described herein . . . shall be treated as strictly confidential and shall not be exploited, disclosed or made use of without the express written consent of the Company." *See* Term Sheet, Exhibit D at 3.

60.     Robert Capelli's request for confirmation of the details of the August 29, 2017 conversation went unanswered.

61.     On September 8, 2017, Kevin Jones of CQ mentioned that he had spoken with his attorney, and that CQ was not making a "derivative" of the Copyrighted Software, so that there was no need to get attorneys involved.

62.     Robert Capelli tried numerous times to confirm what CQ was doing, but CQ did not respond to his emails, and refused to address the matter by phone.

63.     On September 19, 2017, Channel (H) became aware that the Schedule Report Feed ("SRF") and Pre-Certification data were no longer being sent to Channel (H).

64.     The SRF is no longer active, as it has been diverted directly to CQ, and CQ is providing UCSD with daily Pre-Certified patients that qualify for PGX testing, replacing a significant portion of what Channel (H)'s Copyrighted Software was licensed to do.

APP. 032

65.     This functionality represents Channel (H)'s "secret sauce," if you will – the first thing that attracted CQ to Channel (H).  CQ is even directly using Channel (H)'s API End Points to do it.

66.     Nonetheless, log records show that CQ and UCSD were using Channel (H)'s real-time benefits eligibility pre-certification service up until the date when they induced a mid-level contact at UCSD, and close friend of Defendant's Senior Vice President of Sales, to cut off Channel (H)'s access to UCSD's database.

67.     The January 2017 Agreement requires the non-prevailing party to "reimburse the prevailing party for all reasonable costs and expenses, including attorney's fees, incurred in connection therewith." January 2017 Agreement, Exhibit C, ¶ 11.

68.     The May 2017 NDA also provides that: "Each of the Parties agrees that remedies at law may be inadequate to protect against breach of this agreement, and hereby consents to the granting of injunctive relief, whether temporary, preliminary, or final, in favor of the other Party without proof of actual damages." May 2017 NDA, Exhibit E, ¶ 5.

69.     Defendants are using the protected Copyrighted Software on and with the pre-certification process, developed by Channel (H), and SRF, also built by Channel (H), which Defendants are now diverting to themselves from UCSD. Such use is without consent and in violation of Channel (H)'s ownership rights.

70.     As a result of CQ's actions, Channel (H) has suffered irreparable injury through the unauthorized copying, use, replication, modification and possible disclosure of its trade secrets and Copyrighted Software.

71.     Channel (H) has also suffered damages in an amount to be determined at trial, but in no event less than $12,000,000.

APP. 033

## COUNT I
## COPYRIGHT INFRINGEMENT

72.     Channel (H) incorporates herein by this reference each and every allegation contained in each paragraph above.

73.     Channel (H)'s Copyrighted Software constitutes copyrightable subject matter under the Copyright Act, 17 U.S.C. § 101 and Channel (H) owns exclusive rights and privileges in the Copyrighted Software.

74.     Channel (H) filed a copyright application with the United States Copyright Office for the Copyrighted Software. *See* **Exhibit F**.

75.     Since at least as early as September 2017, Defendants have infringed the Copyrighted Software by using, publishing, and displaying same (and/or derivative works thereof) in connection with, *inter alia*, their stolen pre-certification process with UCSD without authorization.

76.     Without authorization, Defendants have copied, reproduced, distributed, publicly displayed, and used the Copyrighted Software after wrongfully stealing Channel (H)'s trade secrets and failing to pay license fees.

77.     Channel (H) did not authorize Defendants' copying, display, distribution or use of its Copyrighted Software outside the context and/or in violation of the agreements set forth above. Defendants have been aware of their infringement at the very latest when they received a cease and desist letter from Channel (H)'s counsel on September 26, 2017.

78.     Defendants have continued to use the Copyrighted Software without payment.

79.     Defendants knew that the infringed Copyrighted Software belonged to Channel (H) and that they did not have permission to exploit Channel (H)'s Copyrighted Software because they explicitly agreed not to do so in connection with the agreements stated above.

80.     Defendants knew that their acts constituted copyright infringement.

APP. 034

81.     Defendants' conduct was willful within the meaning of the Copyright Act.

82.     As a result of their willful, wrongful conduct, Defendants are liable to Channel (H) for copyright infringement pursuant to 17 U.S.C. § 501.  Channel (H) has suffered, and will continue to suffer, substantial losses from the unauthorized use of its copyrighted works.

83.     Channel (H) is entitled to recover damages, which include its losses and any and all profits Defendants have made as a result of their wrongful conduct. 17 U.S.C. § 504.

84.     Alternatively, Channel (H) is entitled to statutory damages under 17 U.S.C. § 504(c).

85.     As a result of the infringement Channel (H) has suffered irreparable harm and Defendants should be preliminarily and permanently enjoined from directly or indirectly infringing Channel (H)'s rights.

86.     In addition, because Defendants' infringement was willful, the award of statutory damages should be enhanced in accordance with 17 U.S.C. § 504(c)(2).

87.     Channel (H) is also entitled to recover its attorney's fees and costs of suit pursuant to 17 U.S.C. § 505.

## COUNT II
## MISAPPROPRIATION OF TRADE SECRETS
## IN VIOLATION OF DELAWARE UNIFORM TRADE SECRETS ACT

88.     Channel (H) incorporates herein by this reference each and every allegation contained in each paragraph above.

89.     Channel (H)'s trade secret technology, Integration Dashboard, data modules, process, workflow documents and specifications ("the Platform") is closely guarded by Channel (H), and resides exclusively on Channel (H)'s Github administration panel located on Channel (H)'s owner's hard drive.

14

90.     Only Channel (H)'s owner has access to the entire Platform.

91.     Channel (H) has taken extensive steps to maintain the confidentiality of the Platform, and strictly limits access to the same.  Three engineers each have access to aspects of the software used in the Platform, but no one but Channel (H)'s owner knows all aspects of how the Platform works – that is, until Defendant's CTO was given access subject to the May 2017 NDA.

92.     Access to the Github administration panel is password protected with various levels of authorization, and such authorization is solely granted to the three engineers by Channel (H)'s owner.

93.     Each of Channel (H)'s engineers either have employment contracts, independent contractor agreements, and/or non-disclosure agreements which expressly limit disclosure of, *inter alia*, software code used in the Platform as well as other trade secrets.  Passwords that are used to access the Platform are also required to be kept confidential.

94.     The hard drive which contains the Platform is in Channel (H)'s owner's sole possession, and is password protected—which password is only known to Channel (H)'s owner.

95.     However, as stated above, despite the engineers' access to parts of the code, no one other than Channel (H)'s owner knows the entire process and trade secret technology.

96.     Under the guise of making an investment in Channel (H), pursuant to the Term Sheet and May 2017 NDA, the CTO of CQ gained full access to Channel (H)'s trade secret technology, code, workflow documents, process and specifications – in other words, detailed instructions on how to build the pre-certification Platform.

APP. 036

97.     Defendants, in willful bad faith, used that confidential trade secret information, that they stole, to build a copycat version of the Platform, circumvent and cut Channel (H) out completely.

98.     Log records show that the Platform was working and being regularly used by CQ from the "go-live" date of July 3, 2017, up until the date that CQ replaced the Platform with its copycat system.

99.     Yet, despite asking for a perpetual license in August 2017, CQ's in-house counsel, on a phone call on Friday September 29, 2017, claimed for the first time that Channel (H)'s solution never worked, and bluntly denied that CQ had stolen its proprietary trade secrets and intellectual property.

100.    On October 3, 2017, the owner of CQ, Alan Meeker, called Robert Capelli with a company Vice President on the line. During that call, Alan Meeker stated that he stood to lose tens of millions of dollars if Robert Capelli went through with his lawsuit, and threatened to make the next two years of his life "very unpleasant" if he did not let the matter drop. Alan Meeker also implied that the trade secrets were his, and refused to allow Channel (H) access to the copycat system.

101.    The pre-certification Platform is an extremely valuable asset for Channel (H) because it enables licensees to automate the application process and pre-certify patients for medical tests – something that no other company offers.

102.    The medical testing industry is a multi-billion dollar industry, and Channel (H)'s technology is capable of increasing sales and revenues for both hospitals and testing companies exponentially.

APP. 037

103.    The Platform provided Channel (H) with a competitive advantage over its competitors, as the only company offering such a solution.

104.    The pre-certification Platform is also extremely valuable to Defendants. By misappropriating the Platform, CQ was able to shortcut years of effort and expense, and roll out a fully functioning pre-certification platform in a fraction of the time that it would have taken it, and at a fraction of the cost, that it would otherwise have required. Indeed, CQ lacked the know-how to build an automated, pre-certification platform, until it stole that know-how from Channel (H).

105.    Indeed, CQ's owner Alan Meeker acknowledged that the Platform is worth at least "tens of millions of dollars" to him and his company.

106.    Defendants knew that the Platform constituted a trade secret of Channel (H).

107.    Due to the parties' multiple agreements specifying the confidential trade secret nature of the Platform, and identical function of CQ's copycat system, Defendants acquired access to the Platform by improper means, in bad faith, knowing that it was a trade secret.

108.    Defendants' unauthorized and surreptitious copying and use of the Platform – after having gained access to Plaintiff's trade secrets under an NDA as a part of a purported investment transaction – was motivated by its bad faith intent to defraud Channel (H) by acquiring its revolutionary pre-certification Platform without any compensation or other exchange of value.

109.    The above acts constitute a theft of Channel (H)'s carefully protected trade secrets. Those trade secrets are highly valuable – the automation of the medical test certification process is a process developed by Channel (H), and gives Channel (H) a competitive advantage in the multi-billion dollar medical diagnostic testing field.

110.    Defendants clearly recognize the competitive advantage that use of Channel (H)'s proprietary solution gave it – having first licensed, then attempted to purchase, and finally

17

circumventing Channel (H) and stealing Platform, after Channel (H) refused to sell its company to CQ.

111.    The magnitude of the harm caused by Defendants' theft of Channel(H)'s trade secrets is staggering.

112.    As a result of CQ's misappropriation of the Platform, Defendants have also been unjustly enriched in the tens of millions of dollars.

## COUNT III
## MISAPPROPRIATION OF TRADE SECRETS
## IN VIOLATION OF DEFEND TRADE SECRETS ACT

113.    Channel (H) incorporates herein by this reference each and every allegation contained in each paragraph above.

114.    As a result of Defendants' conduct above, Defendants have violated the Defendant Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. §§ 1832(a) and 1836.

115.    As such, pursuant to 18 U.S.C. § 1836(b)(3), Channel (H) is entitled to all remedies available under the DTSA.

## COUNT IV
## BREACH OF CONTRACT

116.    Channel (H) incorporates herein by this reference each and every allegation contained in each paragraph above.

117.    Defendants' conduct breaches multiple provisions of the above Agreements.

118.    Defendants are directly violating contractual provisions relating to non-disclosure, circumvention, use, replicating or attempting to compete with, reverse engineering, duplicating, copying, and a number of other prohibitions against the theft of Channel (H)'s intellectual property.

APP. 039

119.    It also appears that such theft was willful — Defendants have been repeatedly warned not to steal Channel (H)'s trade secrets.  Such theft commenced shortly after CQ signed a non-disclosure agreement in connection with its proposed investment in Channel (H), the promise of which induced Channel (H) to make all of its source code and specifications available to CQ's CTO.

120.    Defendants have now circumvented Channel (H) and replicated its pre-certification process and Platform for their own benefit.

121.    As a result of Defendants' breaches of contract, Channel (H) has suffered damages in an amount to be determined at trial, but in no event less than $12,000,000.

122.    CQ is also currently in breach of its payment obligations under the January 2017 Agreement in the amount of $34,842.03, plus interest.

**COUNT V**
**TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**

123.    Channel (H) incorporates herein by this reference each and every allegation contained in each paragraph above.

124.    In or about September 2017, Defendants caused UCSD to terminate Channel(H)'s feed, and caused it to be replaced with CQ's copycat feed.

125.    Defendants induced UCSD to breach its contract with Channel (H) by terminating Channel (H)'s feed without notice.

126.    Such interference was willful, with the intent to cause UCSD to terminate its contract with Channel (H).

127.    As a result of the termination, Channel (H) has suffered the loss of a valuable business relationship and forum for demonstrating its services, and corresponding loss of revenue.

128.    Such acts constitute tortious interference with contractual relations.

**APP. 040**

129.   As a result, Channel (H) has suffered damages in an amount to be determined at trial, but in no event less than $1,000,000.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, awarding Channel (H):

1.   a judgment against Defendants that they have willfully infringed Channel (H)'s rights in its copyrights under 17 U.S.C. § 501;

2.   injunctive relief against Defendants, and that Defendants, their agents, representatives, servants, employees, attorneys, successors and assigns, and all others in active concert or participation with them, be enjoined and restrained from copying, posting or making any other infringing use or infringing distribution of works or other materials owned by or registered to Channel (H);

3.   an order of impoundment pursuant to 17 U.S.C. §§ 503 and 509(a) impounding all infringing copies of Channel (H)'s works or other materials, which are in Defendants' possession or under its control;

4.   general, special, actual and statutory damages pursuant to 17 U.S.C. § 504(b), or enhanced statutory damages pursuant to 17 U.S.C. § 504(c)(2), for Defendants' willful infringement of Channel (H)'s copyrights;

5.   injunctive relief barring Defendants, their agents and employees from continuing to use, operate or employ any intellectual property, confidential information or proprietary information or trade secret of Channel (H), including the pre-certification Platform or any aspect of Channel (H)'s proprietary services or solutions;

APP. 041

6.      actual and statutory damages in an amount to be determined at trial, due to

misappropriation of trade secrets, but in no event less than tens of millions of dollars;

7.      actual damages in an amount to be determined at trial, but in no event less than

$12,000,000 for breach of non-disclosure, non-circumvention, non-use, and other

proprietary rights provisions of the parties' Agreements;

8.      actual damages in the amount of $34,842.03 for breach of payment contract under

the January 2017 Agreement;

9.      actual damages in the amount of $1,000,000 for tortious interference with

contractual relations;

10.     reasonable attorneys' fees, costs, pre- and post-judgment interest, punitive damages

and exemplary damages; and

11.     such other relief as the Court deems just and equitable under the circumstances.

Dated: November 14, 2017                         Respectfully submitted,

                                                 THE APGAR FIRM, PLLC

                                                 By: */s/ Margaret Horton Apgar*
                                                 MARGARET HORTON APGAR
Of Counsel:                                      State Bar No. 24036805
Brett E. Lewis                                   1914 Skillman Street, Suite 110-150
(*pro hac vice* forthcoming)                     Dallas, Texas 75206
Justin Mercer                                    (214) 707-2791 (Phone)
(*pro hac vice* forthcoming)                     (214) 279-6050 (Fax)
Lewis & Lin, LLC                                 margaret@apgarfirm.com
45 Main Street, Suite 608
Brooklyn, New York 11201                         *Attorneys for Plaintiff*
Tel. (718) 243-9323
brett@ilawco.com
justin@ilawco.com

21

APP. 042

## **VERIFICATION**

STATE OF ___MASSACHUSETTS_)

ss:

COUNTY OF _ESSEX COUNTY, MA_)

I, ROBERT CAPELLI, declare under penalty of perjury that:

1. I am an officer of Plaintiff Channel (H), Inc.

2. I have read the foregoing complaint and state that the matters alleged therein are true
   based upon my knowledge, or the relevant business records of Channel (H), Inc.,
   except as to matters alleged on information and belief, and as to those matter I believe
   to be true.

DocuSigned by:

*Robert Capelli*

3FE2A1D095A2453

ROBERT CAPELLI

APP. 043

JS 44 (Rev. 06/17) - TXND (Rev. 06/17)

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Channel (H), Inc. | CQUENTIA SERIES, LLC; HTG SERIES, a series declared by CQUENTIA SERIES, LLC; and D. Alan Meeker |

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
THE APGAR FIRM, PLLC -1914 Skillman Street, Suite 110-150, Dallas, Texas 75206, (214) 707-2791

Attorneys *(If Known)*

### II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ❏ 1   U.S. Government Plaintiff
- ☒ 3   Federal Question *(U.S. Government Not a Party)*
- ❏ 2   U.S. Government Defendant
- ❏ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

### III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

### IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | **PERSONAL INJURY** | | ❏ 423 Withdrawal | ❏ 376 Qui Tam (31 USC |
| ❏ 130 Miller Act | ❏ 310 Airplane   ❏ 365 Personal Injury - | ❏ 690 Other | 28 USC 157 | 3729(a)) |
| ❏ 140 Negotiable Instrument | ❏ 315 Airplane Product   Product Liability | | | ❏ 400 State Reapportionment |
| ❏ 150 Recovery of Overpayment | Liability   ❏ 367 Health Care/ | | **PROPERTY RIGHTS** | ❏ 410 Antitrust |
| & Enforcement of Judgment | ❏ 320 Assault, Libel &   Pharmaceutical | | ☒ 820 Copyrights | ❏ 430 Banks and Banking |
| ❏ 151 Medicare Act | Slander   Personal Injury | | ❏ 830 Patent | ❏ 450 Commerce |
| ❏ 152 Recovery of Defaulted | ❏ 330 Federal Employers'   Product Liability | | ❏ 835 Patent - Abbreviated | ❏ 460 Deportation |
| Student Loans | Liability   ❏ 368 Asbestos Personal | | New Drug Application | ❏ 470 Racketeer Influenced and |
| (Excludes Veterans) | ❏ 340 Marine   Injury Product | | ❏ 840 Trademark | Corrupt Organizations |
| ❏ 153 Recovery of Overpayment | ❏ 345 Marine Product   Liability | | | ❏ 480 Consumer Credit |
| of Veteran's Benefits | Liability   **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ❏ 490 Cable/Sat TV |
| ❏ 160 Stockholders' Suits | ❏ 350 Motor Vehicle   ❏ 370 Other Fraud | ❏ 710 Fair Labor Standards | ❏ 861 HIA (1395ff) | ❏ 850 Securities/Commodities/ |
| ❏ 190 Other Contract | ❏ 355 Motor Vehicle   ❏ 371 Truth in Lending | Act | ❏ 862 Black Lung (923) | Exchange |
| ❏ 195 Contract Product Liability | Product Liability   ❏ 380 Other Personal | ❏ 720 Labor/Management | ❏ 863 DIWC/DIWW (405(g)) | ❏ 890 Other Statutory Actions |
| ❏ 196 Franchise | ❏ 360 Other Personal   Property Damage | Relations | ❏ 864 SSID Title XVI | ❏ 891 Agricultural Acts |
| | Injury   ❏ 385 Property Damage | ❏ 740 Railway Labor Act | ❏ 865 RSI (405(g)) | ❏ 893 Environmental Matters |
| | ❏ 362 Personal Injury -   Product Liability | ❏ 751 Family and Medical | | ❏ 895 Freedom of Information |
| | Medical Malpractice | Leave Act | | Act |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | ❏ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ❏ 896 Arbitration |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights   **Habeas Corpus:** | ❏ 791 Employee Retirement | ❏ 870 Taxes (U.S. Plaintiff | ❏ 899 Administrative Procedure |
| ❏ 220 Foreclosure | ❏ 441 Voting   ❏ 463 Alien Detainee | Income Security Act | or Defendant) | Act/Review or Appeal of |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment   ❏ 510 Motions to Vacate | | ❏ 871 IRS—Third Party | Agency Decision |
| ❏ 240 Torts to Land | ❏ 443 Housing/   Sentence | | 26 USC 7609 | ❏ 950 Constitutionality of |
| ❏ 245 Tort Product Liability | Accommodations   ❏ 530 General | | | State Statutes |
| ❏ 290 All Other Real Property | ❏ 445 Amer. w/Disabilities -   ❏ 535 Death Penalty | **IMMIGRATION** | | |
| | Employment   **Other:** | ❏ 462 Naturalization Application | | |
| | ❏ 446 Amer. w/Disabilities -   ❏ 540 Mandamus & Other | ❏ 465 Other Immigration | | |
| | Other   ❏ 550 Civil Rights | Actions | | |
| | ❏ 448 Education   ❏ 555 Prison Condition | | | |
| | ❏ 560 Civil Detainee - | | | |
| | Conditions of | | | |
| | Confinement | | | |

### V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1   Original Proceeding
- ❏ 2   Removed from State Court
- ❏ 3   Remanded from Appellate Court
- ❏ 4   Reinstated or Reopened
- ❏ 5   Transferred from Another District *(specify)*
- ❏ 6   Multidistrict Litigation - Transfer
- ❏ 8   Multidistrict Litigation - Direct File

### VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
17 U.S.C. § 101; 18 U.S.C. §§ 1832(a) and 1836
Brief description of cause:
Plaintiff brings this action for copyright infringement, misappropriation of trade secrets, and, inter alia, unfair competition.

### VII. REQUESTED IN COMPLAINT:
❏ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ 13,034,842.03

CHECK YES only if demanded in complaint:
JURY DEMAND:   ❏ Yes   ☒ No

### VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE
11/14/2017

SIGNATURE OF ATTORNEY OF RECORD
/s/ Margaret Horton Apgar

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

APP. 044

**INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44**

Authority For Civil Cover SheetThe JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.(a) **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II. **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III. **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV. **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

V. **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

VI. **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

VII. **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If a related case exists, whether pending or closed, insert the docket numbers and the corresponding judge names for such cases. A case is related to this filing if the case: 1) involves some or all of the same parties and is based on the same or similar claim; 2) involves the same property, transaction, or event; 3) involves substantially similar issues of law and fact; and/or 4) involves the same estate in a bankruptcy appeal.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# Exhibit A

# DOCUMENT TO BE FILED UNDER SEAL

# Exhibit B

APP. 048

# DOCUMENT TO BE FILED UNDER SEAL

# Exhibit C

APP. 050

**DOCUMENT TO BE FILED UNDER SEAL**

# Exhibit D

**APP. 052**

# DOCUMENT TO BE FILED UNDER SEAL

# Exhibit E

APP. 054

# DOCUMENT TO BE FILED UNDER SEAL

# Exhibit F

APP. 056

**Registration #:**   *-APPLICATION-*
**Service Request #:**  1-6001984511

## Mail Certificate

Lewis & Lin LLC
Justin Mercer
45 Main Street
45 Main Street
Brooklyn, NY 11201 United States

**Priority:**  Routine        **Application Date:**  November 13, 2017

## Correspondent

**Organization Name:**  Lewis & Lin LLC
**Name:**  Justin Mercer
**Email:**  justin@ilawco.com
**Telephone:**  (718)243-9323
**Address:**  45 Main Street
Suite 608
Brooklyn, NY 11201 United States

Registration Number
# *-APPLICATION-*

## Title

| | |
|---|---|
| **Title of Work:** | Cognitive Data Pipes with Revenue Intellegence |

## Completion/Publication

| | |
|---|---|
| **Year of Completion:** | 2014 |
| **Date of 1st Publication:** | March 01, 2016 |
| **Nation of 1st Publication:** | United States |

## Author

| | |
|---|---|
| • **Author:** | Robert Capelli |
| **Author Created:** | computer program |
| **Work made for hire:** | No |
| **Citizen of:** | United States |
| **Year Born:** | 1973 |

## Copyright Claimant

| | |
|---|---|
| **Copyright Claimant:** | Channel (H), Inc. |
| | P.O. Box 99, Amesbury, MA, 01913, United States |
| **Transfer statement:** | By written agreement |

## Rights and Permissions

| | |
|---|---|
| **Organization Name:** | Lewis & Lin LLC |
| **Name:** | Justin Mercer |
| **Email:** | justin@ilawco.com |
| **Telephone:** | (718)243-9323 |
| **Address:** | 45 Main Street |
| | Suite 608 |
| | Brooklyn, NY 11201 United States |

## Certification

| | |
|---|---|
| **Name:** | Justin Mercer, Esq. |

Page 1 of 2

APP. 058

**Date**:    November 13, 2017

APP. 059

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **CQUENTIA SERIES, LLC AND HTG** | § | |
| **SERIES, A SERIES DECLARED BY** | § | |
| **CQUENTIA SERIES, LLC** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Case No. 4:17-cv-00919-A** |
| | § | |
| | § | **State Court Cause No. 348-295398-17** |
| **CHANNEL (H), INC. AND ROBERT** | § | |
| **CAPELLI** | § | |
| | § | |
| **Defendants.** | § | |

## <u>DECLARATION OF D. ALAN MEEKER</u>

BEFORE ME, THE UNDERSIGNED AUTHORITY, on this day personally appeared D. Alan Meeker, who is personally known to me, and after being duly sworn according to law, upon his oath, was duly deposed and said:

1.     "My name is David Alan Meeker.  I am over twenty-one (21) years of age, am of sound mind, and am in all ways competent to make this affidavit.  I have personal knowledge of the facts stated herein and they are true and correct."

2.     "I am the manager of Total Diagnostix Labs, LLC, a Texas series limited liability company, formerly named 'CQuentia Series, LLC' (referred to herein as '**CQ**'). On October 10, 2017, CQ, plaintiff in the above-styled case, filed a Certificate of Amendment with the Texas Secretary of State, amending its Certificate of Formation to change its name to 'Total Diagnostix Labs, LLC' (the '**Certificate of Amendment**'). A true and correct copy of the Certificate of Amendment is attached hereto as Exhibit D-1."

3.      "As the manager of CQ, I am familiar with CQ's ownership structure, including the identity of all members of CQ (referred to herein as the '**CQ Members**'). The CQ Members are all limited liability companies. As the manager of CQ, I am also familiar with the identity of each member of the CQ Members and domicile of each natural person member of the CQ Members."

4.      "The following table ('Table 1') correctly identifies the CQ Members, each member of the CQ Members, and the domicile of each natural person member of the CQ Members:

Table 1

| CQ Members | Members of CQ Members | Domicile of Natural Person Members of CQ Members |
|---|---|---|
| Axis Global, LLC | David Alan Meeker Family Irrevocable Trust | █████████ |
| J8 Medical, LLC | Kevin Jones | Tennessee |
| Paro Holdings, LLC | Ross Eichberg | Texas |
| JEJM, LLC | Lenora Pope | Texas |
| Blessings Unlimited, LLC | Sandy Alcorn | Texas |
| Phoenician Capital Investors, LLC | Stephen Mallick | Texas |

Daniel H. Meeker is the trustee of the David Alan Meeker Family Irrevocable Trust identified in the table above (referred to herein as '**Trustee**'). The Trustee is my brother and, as such, I have personal knowledge that the Trustee is domiciled in Texas."

5.      "I am also the manager of HTG Series, a series declared by CQ, plaintiff in the above-referenced case (referred to herein as '**HTG**'). As the manager of HTG, I am familiar with HTG's ownership structure, including the identity of all members of HTG (referred to herein as the '**HTG Members**'). The HTG Members are limited liability companies. As the manager of HTG, I am also familiar with the identity of each member of the HTG Members and the domicile of each natural person member of the HTG Members."

6.      "The following table ('Table 2') correctly identifies the HTG Members, the members of the HTG Members, and domicile of each natural person member of the HTG Members:

Table 2

| HTG Members | Members of HTG Members | Domicile of Natural Person Members of HTG Members |
|---|---|---|
| CQ | Axis Global, LLC | |
| | J8 Medical, LLC | |
| | Paro Holdings, LLC | |
| | JEJM, LLC | |
| | Blessings Unlimited, LLC | |
| | Phoenician Capital Investors, LLC | |
| HTG, LLC | Bernardo Barajas | California |

Further affiant sayeth not.

_____
D. Alan Meeker

SUBSCRIBED AND SWORN TO BEFORE ME on this 11th day of December 2017.

[NOTARY SEAL]

_____
Notary Public in and for the State of Texas

My Commission Expires: June 3, 2019

TAMI T. DRUZBA
Notary Public, State of Texas
My Commission Expires
June 03, 2019

| | | |
|---|---|---|
| **Form 424**<br>**(Revised 05/11)**<br><br>Submit in duplicate to:<br>Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>512 463-5555<br>FAX: 512/463-5709<br>**Filing Fee: See instructions** | <br>**Certificate of Amendment** | This space reserved for office use.<br><br>F I L E D<br>In the Office of the<br>Secretary of State of Texas<br>**OCT 1 0 2017**<br>**Corporations Section** |

## Entity Information

The name of the filing entity is:

CQUENTIA SERIES, LLC

State the name of the entity as currently shown in the records of the secretary of state. If the amendment changes the name of the entity, state the old name and not the new name.

The filing entity is a: (Select the appropriate entity type below.)

☐ For-profit Corporation       ☐ Professional Corporation

☐ Nonprofit Corporation       ☐ Professional Limited Liability Company

☐ Cooperative Association       ☐ Professional Association

☑ Limited Liability Company      ☐ Limited Partnership

The file number issued to the filing entity by the secretary of state is:  802266237

The date of formation of the entity is:  August 3, 2015

## Amendments

### 1. Amended Name
(If the purpose of the certificate of amendment is to change the name of the entity, use the following statement)

The amendment changes the certificate of formation to change the article or provision that names the filing entity. The article or provision is amended to read as follows:

The name of the filing entity is: (state the new name of the entity below)

TOTAL DIAGNOSTIX LABS, LLC

The name of the entity must contain an organizational designation or accepted abbreviation of such term, as applicable.

### 2. Amended Registered Agent/Registered Office

The amendment changes the certificate of formation to change the article or provision stating the name of the registered agent and the registered office address of the filing entity. The article or provision is amended to read as follows:

APP. 064

**Registered Agent**
(Complete either A or B, but not both. Also complete C.)

☐  A.  The registered agent is an organization (cannot be entity named above) by the name of:

OR

☑  B.  The registered agent is an individual resident of the state whose name is:

| ROSS | E | EICHBERG | |
|------|---|----------|---|
| *First Name* | *M.I.* | *Last Name* | *Suffix* |

The person executing this instrument affirms that the person designated as the new registered agent has consented to serve as registered agent.

C.  The business address of the registered agent and the registered office address is:

| 4770 BRYANT IRVIN COURT, SUITE 400 | FORT WORTH | TX | 76107 |
|------------------------------------|-----------|-----|-------|
| *Street Address (No P.O. Box)* | *City* | *State* | *Zip Code* |

### 3. Other Added, Altered, or Deleted Provisions

Other changes or additions to the certificate of formation may be made in the space provided below.  If the space provided is insufficient, incorporate the additional text by providing an attachment to this form.  Please read the instructions to this form for further information on format.

Text Area (The attached addendum, if any, is incorporated herein by reference.)

☐ **Add** each of the following provisions to the certificate of formation.  The identification or reference of the added provision and the full text are as follows:

☐ **Alter** each of the following provisions of the certificate of formation.  The identification or reference of the altered provision and the full text of the provision as amended are as follows:

☐ **Delete** each of the provisions identified below from the certificate of formation.

## Statement of Approval

The amendments to the certificate of formation have been approved in the manner required by the Texas Business Organizations Code and by the governing documents of the entity.

Form 424                                    7

**Effectiveness of Filing** (Select either A, B, or C.)

A. ☑ This document becomes effective when the document is filed by the secretary of state.

B. ☐ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing. The delayed effective date is: _____

C. ☐ This document takes effect upon the occurrence of a future event or fact, other than the passage of time. The 90th day after the date of signing is: _____

The following event or fact will cause the document to take effect in the manner described below:

---

# Execution

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

Date:   OCTOBER 6, 2016

By:   _Cuuentia Series, LLC_
_____
Signature of authorized person

D. ALAN MEEKER, Manager
_____
Printed or typed name of authorized person (see instructions)

APP. 066